# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
### GAINESVILLE DIVISION

**WOODY H. NORTON,**

 **Plaintiff,**

**vs.**        **Case No.  1:16cv357-CAS**

**NANCY A. BERRYHILL, Acting
Commissioner of the Social
Security Administration,**

 **Defendant.**

_____/

## MEMORANDUM OPINION AND ORDER

This Social Security case was referred to the undersigned upon

consent of the parties, ECF No. 7, by United States District Judge Maurice

M. Paul.  ECF No. 8.  It is now before the Court pursuant to 42 U.S.C.

§ 405(g) for review of the final determination of the Acting Commissioner

(Commissioner) of the Social Security Administration denying Plaintiff's

application for a period of disability and Disability Insurance Benefits (DIB)

pursuant to Title II of the Social Security Act.  After careful consideration of

the record, the decision of the Commissioner is reversed and the case is

remanded for further proceedings.

## I. Procedural History

On October 3, 2013, Plaintiff, Woody H. Norton, filed an application for a period of disability and DIB benefits, alleging disability beginning August 1, 2011.  Tr. 27, 183-92, 227.[1]  The application was based on chronic nerve, joint, foot, neck, and back pain; degenerative disk disease – extreme; recent eye problems; high anxiety; frequent pain attacks and inability to perform normal daily duties; memory loss, depression, and extreme tinnitus. Tr. 42, 231.  The application was initially denied on December 20, 2013, and on reconsideration on July 3, 2014.  Tr. 27, 84-127.  Plaintiff's last date insured for DIB benefits is December 31, 2015. Tr. 27, 227.

On August 26, 2014, Plaintiff requested a hearing.  Tr. 27, 131-32. On March 8, 2016, Administrative Law Judge (ALJ), Angela L. Neel, held a hearing in Tampa, Florida.  Tr. 27, 48-83.  Plaintiff was represented by F. Emory Springfield, an attorney.  Tr. 18, 27, 48-50, 128-30.  Plaintiff and Scott E. Brown, an impartial vocational expert, testified at the hearing.  Tr. 27, 53-82, 309 (Resume), 320 (case analysis).

---

[1]  Citations to the transcript/administrative record, ECF No. 10, shall be by the symbol "Tr." followed by a page number that appears in the lower right corner of each page.

On March 30, 2016, Plaintiff's counsel submitted medical records from Christopher M. Leber, M.D., of Southeastern Rehabilitation Medicine[2] that were marked Exhibit 35F, Tr. 837-45, and considered by the ALJ. Tr. 27.  The ALJ noted, however, these records were "exact duplicates of Exhibit 33F," *see* Tr. 824-33.  *Id.*  Exhibit 34F is a March 8, 2016, medical opinion from Dr. Leber regarding Plaintiff's ability to do work-related activities, Tr. 835-36, which was considered by the ALJ.  Tr. 37.

The ALJ issued a decision on April 14, 2016, finding that Plaintiff retained the residual functional capacity (RFC) to perform light work, with certain exceptions, that he could perform a significant number of jobs in the national economy, and, as a result, was not disabled.  Tr. 27-40.  On May 9, 2016, Plaintiff requested review from the Appeals Council and submitted a detailed letter/brief in support of the request for review and, in addition, submitted a May 18, 2016, one-page letter from Robert A. Guskiewicz, M.D., from Southeastern Interventional Pain Management, *see supra* at n.2 (same logo), who opined that Plaintiff "is not capable gainful employment even in the sedentary capacity."  Dr. Guskiewicz stated that he sent Plaintiff to Dr. Leber in February 2016 who confirmed his findings and

---

[2]  The letterhead also refers to SIMED-Southeastern Integrated Medical as a logo.  Tr. 10

assessments, Tr. 825-32 (Exhibit 33F), 837-44 (Exhibit 35F).  Tr. 8-10, 18-23, 321-24.

On September 26, 2016, the Appeals Council denied review noting it considered the reasons Plaintiff disagreed with the ALJ's decision and the "Misc Medical Records" submitted by Plaintiff's counsel dated November 17, 2015, and July 18, 2014 (3 pages), Tr. 846-48 (Exhibit 36F).  Tr. 1-6.

The Appeals Council also considered the letter/opinion from Dr. Guskiewicz of May 18, 2016, *see infra* at n.12, but noted that the ALJ decided the case through December 31, 2015, the date Plaintiff was last insured for disability benefits and, as a result, this letter/opinion was new information about a later time and did not affect the decision regarding Plaintiff's disability.  The Appeals Council found no basis to depart from the ALJ's decision.  Tr. 2.

Plaintiff filed his Complaint in this Court on November 23, 2016, ECF No. 1, and the Defendant filed an Answer on February 9, 2017.  ECF No. 9. The parties filed memoranda of law, which have been considered.  ECF Nos. 16, 17.

## II.  Findings of the ALJ

The ALJ made several findings:

1.  "The claimant last met the insured status requirements of the Social Security Act through December 31, 2015."  Tr. 29.

2. "The claimant did not engage in substantial gainful activity during the period from his alleged onset date of August 1, 2011[,] through his date last insured of December 31, 2015." *Id.*

3. "Through the date last insured, the claimant had the following severe impairments: degenerative disc disease of the cervical, thoracic, and lumbar spines; degenerative joint disease of the left knee, status post arthroscopic surgery; moderate, centric left ventricular hypertrophy; depressive disorder; anxiety disorder; unspecified personality disorder; somatic symptom disorder; and alcohol abuse." *Id.*

The ALJ noted that the impairments were found to be severe because they cause more than minimal limitation in the claimant's ability to engage in basic work activities. *Id.* The ALJ also noted that Plaintiff had been treated for paresthesia, mild obstructive sleep apnea with hypoxemia, mild aortic valve sclerosis, decreased visual acuity, and bilateral sensorineural hearing loss, but the evidence did not support that any of these impairments caused Plaintiff more than minimal functional limitations and were, therefore, nonsevere. Tr. 29-30.

4. "Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." Tr. 30.

The ALJ considered whet Plaintiff's torn meniscus in his left knee and degenerative disc disease of the cervical, thoracic, lumbar spines met relevant listings and found that they did not. Tr. 30-31. The ALJ also considered whether the severity of Plaintiff's mental impairments met or medically equaled the criteria of several listings and likewise determined they did not. Tr. 31. To satisfy "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities in daily living; marked difficulties in concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration. *Id.* The ALJ found Plaintiff had *mild* restriction in activities of daily living - he can prepare basic meals, goes outside daily, and can perform basic household

chores; *mild* difficulties in social functioning - he goes grocery shopping occasionally, lives with his sister and her husband and reports he gets along well with his spouse; and *moderate* difficulties in concentration, persistence or pace - although he testified and reported difficulties with his concentration and memory. Although a consultative examination indicated he had some difficulties with immediate memory, his remote memory appeared to be intact and he was able to perform mental addition of double-digit numbers and simple multiplication. *Id.* The ALJ found *no* episodes of decompensation that have been of extended duration. *Id.* The ALJ stated that the RFC assessment "reflects the degree of limitation [the ALJ] found in 'paragraph B' mental function analysis." Tr. 32. The ALJ found the criteria of "paragraph C" were not met. *Id.*

5. "After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b). The claimant is able to lift/carry and push/pull up to twenty pounds occasionally, ten pounds frequently. The claimant is able to sit, stand and/or walk for six hours in an eight-hour workday with customary work breaks. However, the claimant should avoid overhead work activity; climbing ladders, ropes and scaffolds; kneeling and crawling. The claimant is limited to occasional climbing ramps and stairs, stooping, and crouching. The claimant should avoid work at unprotected heights or around hazardous, moving mechanical parts. Mentally, the claimant is limited to performing simple, routine, and repetitive tasks and making simple work-related decisions." Tr. 32.

6. "Through the date last insured, the claimant was unable to perform any past relevant work" as a snow plow operator, tank driver, and food service manager. Tr. 38-39. The ALJ noted that the vocational expert testified that "a person with the claimant's [RFC] would be unable to perform the claimant's past relevant work." Tr. 39.

7. "The claimant was . . . 53 years old, which is defined as a younger individual age 18-49, on the date last insured."[3] *Id.*

---

[3] A person 53 years old is a person closely approaching advanced age (50-54), not a younger individual (18-49). 20 C.F.R. § 404.1563(c)-(d). A person of advanced age is age 55 or older. 20 C.F.R. § 404.1563(e). At step 5, the ALJ determined that a finding of 'not disabled' would be directed by the Medical-Vocational Rule 202.21,

8. "The claimant has at least a high school education and is able to communicate in English." *Id.*

9. "Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills." *Id.*; *see supra* at n.3.

10. "Through the date last insured, considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform." *Id.*

Relying in large part on the vocational expert's testimony at the hearing, the ALJ found, based on all these factors, that the Plaintiff would be able to perform representatives jobs designated as light exertion, with an SVP of 2, unskilled work such as ticket taker (DOT 344.667-010), survey worker (DOT 205.367-054), and ticket seller (DOT 211.467-030).[4]  Tr. 40.

---

Tr. 39, that pertains to a younger individual capable of performing light work, as a high school graduate or more and with previous work experience as skilled or semiskilled-skills not transferable.  20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 202.21.  Plaintiff points out the ALJ erred in this regard, but does not argue this requires reversal.  ECF No. 16 at 3 n.1.  It appears the appropriate rule is Rule 202.14, which indicates a result of "not disabled."  *Id.* at Rule 202.14.

[4] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 404.1568(a).  A Specific Vocational Preparation (SVP) of two means "[a]nything beyond short demonstration up to and including 1 month."  Dictionary of Occupational Titles (DOT) (4th ed., rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP.  "[SVP] is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  *Id.*  Unskilled work corresponds to an SVP of one and two.  Social Security Ruling (SSR) 00-4p, 2000 SSR LEXIS 8, at *8 (Dec. 4, 2000).  Further, unskilled work is work involving understanding, remembering, and carrying out simple instructions; making simple work-related decision; dealing with changes in a routine work setting; and responding appropriately to supervision, co-workers, and usual work situations.  SSR 85-15, 1985 SSR LEXIS 20, at *10-11 (1985).

11. "The claimant was not been under a disability, as defined in the Social Security Act, from August 1, 2011, the alleged onset date, through December 31, 2015, the date last insured." *Id.*

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[5] The Court may not decide the facts anew, reweigh the

---

In part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

[5] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported

evidence, or substitute its judgment for that of the Commissioner,

Bloodsworth, 703 F.2d at 1239, although the Court must scrutinize the

entire record, consider evidence detracting from the evidence on which the

Commissioner relied, and determine the reasonableness of the factual

findings. Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992); Parker v.

Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986). Review is deferential, but

the reviewing court conducts what has been referred to as "an independent

review of the record." Flynn v. Heckler, 768 F.2d 1273, 1273 (11th Cir.

1985).

A disability is defined as a physical or mental impairment of such

severity that the claimant is not only unable to do past relevant work, "but

cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national

economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage

in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not

less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509

---

by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

(duration requirement). Both the "impairment" and the "inability" must be

expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212

(2002). In addition, an individual is entitled to disability insurance benefits

(DIB) if he is under a disability prior to the expiration of his insured status.

*See* 42 U.S.C. § 423(a)(1)(A); Moore, 405 F.3d at 1211; Torres v. Sec'y of

Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz

Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps, pursuant to 20

C.F.R. § 404.1520(a)(4)(i)-(v):

1. Is the individual currently engaged in substantial gainful
activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet
or equal those listed in Appendix 1 of 20 C.F.R. Part 404,
Subpart P?

4. Does the individual have the residual functional capacity
(RFC) to perform work despite limitations and are there any
impairments which prevent past relevant work?[6]

---

[6] An RFC is the most a claimant can still do despite limitations. 20 C.F.R.
§ 404.1545(a)(1). It is an assessment based upon all of the relevant evidence including
the claimant's description of her limitations, observations by treating and examining
physicians or other persons, and medical records. *Id.* The responsibility for
determining claimant's RFC lies with the ALJ. 20 C.F.R. § 404.1546(c); *see* Social
Security Ruling (SSR) 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) ("The term
"*residual functional capacity assessment*" describes an adjudicator's finding about the
ability of an individual to perform work-related activities. The assessment is based upon
consideration of all relevant evidence in the case record, including medical evidence
and relevant nonmedical evidence, such as observations of lay witnesses of an
individual's apparent symptomatology, an individual's own statement of what he or she

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled. If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience. Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g). If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work

---

is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence."). The Court will apply the SSR in effect when the ALJ rendered her decision. *See generally* Bagliere v. Colvin, No. 1:16CV109, 2017 U.S. Dist. LEXIS 8779, at *10-18, (M.D. N.C. Jan. 23, 2017), *adopted*, 2017 U.S. Dist. LEXIS 51917 (M.D. N.C. Feb. 23, 2017).

suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

Plaintiff bears the burden of proving that he is disabled, and consequently, is responsible for producing evidence in support of his claim. *See* 20 C.F.R. § 404.1512(a); Moore, 405 F.3d at 1211.  The responsibility of weighing the medical evidence and resolving any conflicts in the record rests with the ALJ.  *See* Battle v. Astrue, 243 F. App'x 514, 523 (11th Cir. 2007) (unpublished).

As the finder of fact, the ALJ is charged with the duty to evaluate all of the medical opinions of the record and resolve conflicts that might appear.  20 C.F.R. § 404.1527.  When considering medical opinions, the following factors apply for determining the weight to give to any medical opinion: (1) the frequency of examination and the length, nature, extent of the treatment relationship; (2) the evidence in support of the opinion, such as "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist and, if it is, it will be accorded greater weight; and (5) other relevant but unspecified factors. 20 C.F.R. § 404.1527(b) & (c)(1)-(6).

The opinion of the claimant's treating physicians must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). "This requires a relationship of both duration and frequency." Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips, 357 F.3d at 1241. "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." MacGregor, 786 F.2d at 1053.

The ALJ may discount the treating physician's opinion if good cause exists to do so. Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986).

Good cause may be found when the opinion is "not bolstered by the

evidence," the evidence "supported a contrary finding," the opinion is

"conclusory or inconsistent with [the treating physician's own medical

records," the statement "contains no [supporting] clinical data or

information," the opinion "is unsubstantiated by any clinical or laboratory

findings," or the opinion "is not accompanied by objective medical evidence

or is wholly conclusory." Lewis, 125 F.3d at 1440; Edwards v. Sullivan, 937

F.2d 580, 583-84 (11th Cir. 1991) (citing Schnorr v. Bowen, 816 F.2d 578,

582 (11th Cir. 1987)). Further, where a treating physician has merely made

conclusory statements, the ALJ may afford them such weight to the extent

they are supported by clinical or laboratory findings and are consistent with

other evidence as to a claimant's impairments. Wheeler v. Heckler, 784

F.2d 1073, 1075 (11th Cir. 1986).

Further, opinions on some issues, such as whether the claimant is

unable to work, the claimant's RFC, and the application of vocational

factors, "are not medical opinions, . . . but are, instead, opinions on issues

reserved to the Commissioner because they are administrative findings that

are dispositive of the case; i.e., that would direct the determination or

decision of disability." 20 C.F.R. § 404.1527(d); *see* Bell v. Bowen, 796

F.2d 1350, 1353-54 (11th Cir. 1986); *see also supra* at n.6. "[T]reating

source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance."  SSR 96-5p, 1996 SSR LEXIS 2, at *6 (July 2, 1996; rescinded eff. Mar. 27, 2017).  Although physician's opinions about what a claimant can still do or the claimant's restrictions are relevant evidence, such opinions are not determinative because the ALJ has responsibility of assessing the claimant's RFC.

Generally, more weight is given to the opinion of a specialist "about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  20 C.F.R. § 404.1527(c)(2), (5); *see also* Benecke v. Barnhart, 379 F.3d 587, 594 n.4 (9th Cir. 2004) (noting that "[s]pecialized knowledge may be particularly important with respect to a disease such as fibromyalgia that is poorly understood within much of the medical community," thus rheumatologists' opinions were entitled to greater weight than those of other physicians) (Benecke quoted in Somogy v. Comm'r of Soc. Sec., 366 F. App'x 56, 65 n.13 (11th Cir. 2010) (unpublished)).  Although a claimant may provide a statement containing a treating physician's opinion of his remaining capabilities, the ALJ must evaluate such a statement in light of the other evidence presented and the ALJ must make the ultimate determination of disability.  20 C.F.R. §§ 404.1512, 404.1513, 404.1527, 404.1545.

## IV. Legal Analysis

### Substantial Evidence does not support the ALJ's decision.

#### I.

Plaintiff argues the ALJ erred in not giving the opinions of Plaintiff's treating physicians substantial or considerable weight; erred in not stating with particularity the weight given to the medical opinions of four of Plaintiff's treating physicians and one psychologist; that substantial evidence does not support the weight the ALJ gave to the opinions of the non-examining agency psychologist and consultative examining psychologist whose opinions were rendered 20 months before the hearing; and by giving great weight to the opinion of a consultative medical examining physician rendered 27 months before the hearing. ECF No. 16 at 2.

#### II.

Plaintiff alleged disability as of August 1, 2011. Tr. 27. The ALJ discusses Plaintiff's examination and treatment patient records prior to this date beginning with a motor vehicle accident, which resulted in neck pain. Tr. 34. The ALJ notes that "[j]ust prior to the alleged onset date, in June 2011, the claimant presented to Dr. Richard Herrington for a follow up on his pain medications. The claimant continued to report stiffness and pain in

his neck and back, and Dr. Herrington's notes indicated that the claimant did undergo a discectomy and fusion in 2004 (2F). More recent x-rays of the claimant's cervical spine showed a C4 through C7 fusion with an anterior cervical plate." Tr. 34. The following is a brief discussion of some of the events leading up to August 1, 2011.

Plaintiff was involved in a motor vehicle accident on March 1, 2002. Tr. 326. Within one to two days after the accident, he developed left scapular region pain as well as some left-sided neck pain and, shortly thereafter, he developed some left hand paresthesias, occurring intermittently. Plaintiff consulted with a chiropractor and received short-term relief only with each visit and was referred to Dave Jensen, D.C., for further consultation and treatment. *Id.*

On May 16, 2002, Plaintiff was examined and treated by Donald Corenman, M.D., at the Steadman Hawkins Clinic, Vail Clinic, Colorado. Tr. 326. Plaintiff had an MRI on May 23, 2002. Tr. 327. It was reported that as of December 19, 2002, he had had epidurals/selective nerve root blocks and continued chiropractic care and tried acupuncture, Pilates, and other therapies. Tr. 330. On April 12, 2003, Plaintiff underwent a C4, C5, and C6 fusion after which his neck pain remitted, although he began having bilateral shoulder and interscapular pain. Tr. 365. It was noted that

Plaintiff had recently seen Dr. Corenman who requested bilateral C7-T-1 facet joint injections by Kurt Sonnenberg, M.D., at Valley View Hospital, Glenwood Springs, Colorado.  Tr. 365-66.  Plaintiff reported continuing pain in his left neck, shoulder and upper arm, although a recent diskogram showed it was not concordant with his left shoulder.  Dr. Corenman requested diagnostic selective nerve root blocks to see if the C-4 root was responsible for the shoulder pain.  Tr. 374.

On April 19, 2005, Dr. Corenman noted that Plaintiff visited with him "for continuing diagnosis of his neck pain, left shoulder pain, and left upper arm pain."  Tr. 349.  It is further noted that Plaintiff "knows that he is a 'stressful person.'  He states when he goes home he normally has a 6 pack and a couple of Jim Beans [sic].  He was on Lexapro, which did help his symptoms, and I think he does have bona fide pathology at the 3-4 disc, but his anxiety is magnifying his current pain."  *Id.*  Dr. Corenman believed Plaintiff "has an anxiety disorder," but "believe[s] he treats it with alcohol." *Id.*  They discussed treatment.  Plaintiff was taking between 2-3 Percocet a day for pain, but there are days he did not have to take it.  Plaintiff was restricted to no more than 75 pills a month.  Dr. Corenman noted further that Plaintiff "can continue working with the current restrictions he has."  *Id.*

There are patient records from approximately 2007 through 2011 relating, in part, to assistance with chronic pain management. Tr. 379-448. Patient notes of October 27, 2009, developed for his yearly review at Roaring Fork Family Physicians, Carbondale, Colorado, noted that Plaintiff goes to Florida from November through February and needed renewals on his pain medications.[7] Tr. 433. It is noted that he had chronic neck pain due to degenerative disc disease and has had a C4-C6 fusion. *Id.* On average, he took four Percocet per day for pain; Valium and Soma helped him to sleep. Plaintiff continued to work. The assessment and plan included chronic neck pain due to degenerative disc disease and he was to continue current pain management. "He did not tolerate long-acting opiates. He desires to get off opiates altogether, but is unable at this time." *Id.*

A patient note from Roaring Fork Family Practice of June 8, 2011, from Richard A. Herrington, M.D., (chronic pain management) indicates

---

[7] Plaintiff was injured on January 23, 2008, while working and moving a piece of equipment by hand and slipped and fell. Apparently, Plaintiff was pulling a unit trailer hitch and slipped and fell striking his left shoulder on the pavement. Tr. 425. At this time, his employer is listed as Gunnison County Public Works and he worked as a heavy equipment operator for one month. *Id.* A patient note from February 5, 2008, relates to a cervical spine strain with left shoulder contusion superimposed upon chronic degenerative cervical disc disease and further notes that Plaintiff agreed with the healthcare provider that he had reached maximum medical improvement; there was no new permanent impairment; and they reviewed "his chronic and pre-existing work restrictions which are including a maximum 50 pounds left and no overhead lifting." Tr. 427.

Plaintiff made the visit for help with chronic pain; that he had been in

Florida for the winter; was able to sell his barbecue restaurant in Marble

and still worked there for the summer.  Tr. 379.  Plaintiff intended to move

to Gainesville, Florida, in the early fall.  His problem lists included

degenerative cervical spine disease, chronic pain syndrome, and narcotic

use, chronic.  *Id.*  A prior note from Dr. Herrington dated November 1,

2010, indicates Plaintiff sought to re-establish care for chronic pain

management and for help on filling prescriptions because he reported

being in Florida for the winter.  Tr. 380.  Plaintiff is from Florida originally;

he and his wife operated a restaurant in Marble 8 months per year, 60-80

hours per week; and he is returning to his home in Gainesville for the

winter.  *Id.*

III.

### A.  Activities of Daily Living

As part of the analysis of Plaintiff's RFC, the ALJ analyzed Plaintiff's

activities of daily living.[8]  Tr. 33-34; *see* Tr. 31.  The ALJ considered

-----

[8]  The ALJ may consider a claimant's daily activities when evaluating subjective complaints of disabling pain and other symptoms.  Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 404.1529(c)(3)(i).  *But see* Lewis v. Callahan, 125 F.3d at 1441 ("participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability).

representations made in pre-hearing function reports and Plaintiff's hearing

testimony.  *Id.*

> In application documents, the claimant indicated that his ability to work is limited by his physical and conditions; his conditions cause him pain or other symptoms.  The claimant is 5'11" and weighed 175 pounds.  The claimant has more than a high school education and has vocational training as a chef (4E).

> However, it should be noted that in a function report, the claimant indicated that he is able to perform a wide range of activities of daily living.  The claimant indicated that he cares for a dog.  The claimant is able to use the toilet.  The claimant indicated that he is able to prepare soups, salads and sandwiches, and is able to feed himself. The claimant is able to wash dishes, sweep, do laundry, and perform light duty yard work.  The claimant is able to drive a car and occasionally shop for groceries.  The claimant indicated that he is able to pay bills, count change, handle a savings account, use a checkbook or money order.  The claimant indicated that he enjoys watching the History and Discovery Channels on television.   The claimant indicated that he is able to lift/carry up to fifteen pounds. The claimant indicated that he is able to follow both written and spoken instructions "pretty good" and has no problem getting along with authority figures.  It should be noted that in the Remarks section of the form, the claimant initially indicated, "Like I said in some of the other forms, some of my days are really good and around bearable but most of my days are filled with pain, [between] 6-8 [on the pain scale]."   The claimant then crossed out the language about having "really good" days and indicated instead that the pain is bearable on some days, then added that his pain is "often 9-10."  The claimant indicated that he had changed his answers after a conversation with "D. Lawrence."  (1E and 2E) [*See infra* at n.9].

> At the hearing, the claimant confirmed that . . . he is fifty-three years old.  The claimant testified that he had lost a pound since his application date; he weighed 174 pounds.  The claimant testified that he is disabled and unable to work due to his physical and mental impairments.   However, the claimant also testified to a wide

range of activities of daily living. The claimant testified that he has a driver's license and is able to drive. The claimant testified that he lives with his sister and her husband. The claimant testified that he has no side effects from his prescribed medication with the exception of occasional constipation. He further testified that he used to be a pretty good cook and has a culinary arts degree; he is able to make simple meals now, like warming up a frozen, chicken potpie. He is also able to do the dishes and sweep on occasion. During the day, the claimant enjoys sitting on his porch and watching birds.

The claimant testified that he has past work as the owner of a barbeque restaurant from 2007 to 2010. However, the undersigned questioned the claimant as to why there were no earnings reflected during the alleged period that he owned a barbeque restaurant. The claimant testified that he "did not pay himself wages." The claimant's earnings records reflect a very small amount of self-employment earnings only in 2010, presumably from the barbeque restaurant, and wages after he sells the barbeque restaurant to Slow Groovin' BBQ in 2011 and worked there briefly as a line cook. When the undersigned questioned the claimant with regard to his involvement at the restaurant, the claimant initially testified that he cooked some but was rarely at the restaurant, and that the restaurant essentially ran itself. He testified that he did not do any of the bookkeeping, etc., for the business. However, after a series of leading questions from Mr. Springfield, the claimant's attorney, the claimant changed his story and testified that he was cooking full-time, always at the restaurant and that the restaurant did not run itself.

With regard to pain, the claimant testified that the majority of his pain was in his neck, although he did have some pain, to a much lesser extent in his low back, ankles and feet. However, Mr. Springfield, the claimant's attorney, over the undersigned's objection, attempted to refresh the claimant's memory by showing him a "pain map" the claimant completed on January 20, 2015, that indicated that he was experiencing "extreme" pain in his low back at the time. Suddenly, the claimant testified that the pain in his low back pain is "extreme." However, it should be noted that a review of the pain map reveals that although the claimant

indicated that the pain in his lower back was "extreme" at the time, he indicated that the claimant [sic] that the majority of his pain is in fact in his neck (17F, 10). Records indicate that x-rays of the claimant's ankles and feet were negative (17F, 2). Records also indicate that the claimant requested referral to rehabilitation medicine because "he has a disability determination hearing in the spring." (27F, 2).

With regard to alcohol use and abuse, the claimant testified that he was proud of himself because he "had not had a drop of liquor in the past thirty-three days" and was sticking to it. However, upon further questioning, the claimant testified that he has not had hard liquor in thirty-three days; he continues to drink wine, and smoke cigars.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record.

Tr. 33-34.

After discussing Dr. Chodosh's consultative physical examination

evaluation, the ALJ also noted:

In addition to pain management, the claimant also sought chiropractic treatment around this same time starting in late 2011. Although the claimant reported worsening symptoms, during an office visit in February 2012, the claimant reported that he was helping a friend do carpenter work. Despite the claimant's consistent reports of ongoing pain, he did reference instances throughout 2012 and early 2013 where he was doing some kind of physical labor which caused increases in pain. For example, in November 2012, the claimant reported that his lower back pain began after bending and lifting. Then in February 2013, the claimant indicated that he had lower back pain after doing some home remodeling. Additional example [sic] of physical labor

during this time included working in the claimant's garden and working on his tractor (12F).

Tr. 35.[9]

## B.  Dr. John Stevenson, Dr. Robert Guskiewicz, and Dr. Sassano

The ALJ began a discussion of Plaintiff's examination and treatment

with John C. Stevenson, M.D., when on March 23, 2012,[10] Tr. 506.

Dr. Stevenson

> noted that the claimant had normal gait with negative straight leg raise tests bilaterally (3F at 70).  A cervical CT scan performed thereafter noted that the fusion from C4 to C7 was solid with his plate in good position (3F at 72, 4F).  He was found to have degenerative disc and joint disease at C3-4, and subsequently underwent C3-4 anterior cervical discectomy and fusion surgery.  Post-surgery, the claimant followed up doing well with normal muscle tone and strength in both upper extremities (3F at 74 [Tr. 458, July 5, 2012]).  He did present to the hospital with reports of pain in a few days after the surgery, but upon physical examination had no neck tenderness, normal range of motion in his extremities, and painless range of motion in his back.  A CT scan of the claimant's cervical spine also confirmed no acute complication (5F).  By June [July 24,] 2013, the claimant continued to experience some neck pain, but there was no evidence of radiculopathy [although he had "intractable neck pain," required "chronic pain management" and referred to Dr. Sassano for pain management] (3F at 76 [Tr. 460]).

---

[9]  In his memorandum, Plaintiff indicates that part of the ALJ's daily activities findings are "selectively taken from parts of exhibit 2E." ECF No. 16 at 13 n.13.  Plaintiff offers several clarifications and additions from Plaintiff's pre-hearing statements.  ECF No. 16 at 13.  Plaintiff states that "D. Lawrence" is an agency employee.  *Id.*

[10]  At this visit, Dr. Stevenson referred Plaintiff to a doctor for pain management.  *Id.*

Tr. 34.[11]

The ALJ discussed other patient records, including pursuing pain

management with Dr. Sassano in December 2013 and "[i]nto 2014" and

noted:

> Later, in December 2013, the claimant continued with pain
> management treatment for his neck pain with Dr. John Sassano.
> Treatment notes confirm that the medications were effective with the
> claimant's pain noted as improved. Objective findings from this
> examination noted that the claimant had normal gait and station, full
> and symmetrical muscle strength, tone and size throughout the upper
> and lower extremities, and normal and symmetrical deep tendon
> reflexes (10F).
>
> **** [discussion of Dr. Chodosh's evaluation and chiropractic
> treatment/Plaintiff's physical labor-2012-2013]
>
> Into 2014, the claimant continued receiving pain management
> treatment from Dr. Sassano. Despite the claimant's continued
> reports of pain in his back and joints, objective findings indicated full
> and symmetrical muscle strength, tone and size throughout in the
> upper and lower extremities. There was some moderate tenderness
> in the lumbar spine, but the claimant's medications for pain were
> noted as improving his symptoms (13F).

Tr. 35.

Plaintiff began seeing Dr. Sassano in October 2013 and continued to

see him until April 2014. Tr. 525-33, 582-601. The ALJ paraphrases from

this treating physician's notes as noted above, but does not identify with

---

[11] It was at this visit (July 24, 2013) when Dr. Stevenson remarked: "He is
certainly a candidate for disability." Tr. 460.

particularity the weight given to his opinions regarding pain management.

The ALJ gives some weight to Dr. Sassano's response to a supplemental

pain questionnaire (responding to two questions) of May 2, 2014, when he

opined that Plaintiff did not suffer from a mental impairment that

significantly interfered with daily functioning and that no medication had

been prescribed for mental impairment. Tr. 602-03. (Dr. Sassano did not

treat Plaintiff for mental impairments.) The ALJ did not discuss

Dr. Sassano's assessment of Plaintiff's cervicalgia, cervical radiculopathy,

post-laminectomy pain syndrome, cervical; back pain, thoracic; diabetic

neuropathy and low back pain, which were uniformly noted as "condition

worse." Tr. 527, 531, 589, 592, 596, 600. As of December 5, 2013,

Dr. Sassano assessed Plaintiff's cervicalgia, cervical radiculopathy, and

post-laminectomy pain syndrome, cervical, as "worse," information missing

from the ALJ's discussion, Tr. 35. Tr. 527; *see* Tr. 531, 589, 592, 596, 600,

for similar assessments.

For the December 5, 2013, visit, Dr. Sassano noted under "review of

systems" for musculoskeletal and neurological: "*limitation of use of a joints;

muscle pain; back pain, neck pain, joint pain, and stiffness in joints*" and

"*weakness*," respectively. Tr. 525. It is noted, however, under "Objective"

that Plaintiff has "[n]ormal gait and station, digits and nails"

(musculoskeletal) and generally normal findings regarding his neurologic component, except for noting "[s]ensory examination for light touch in the upper extremities on the left *paresthesia*s in a C8 distribution." Tr. 526. By April 9, 2014, it is noted that Plaintiff has "*[t]enderness* in midline *at L4-moderate*; *at L5-moderate*" (musculoskeletal) and the neurological exam is generally normal, except under "[s]ensory examination for light touch in the upper extremities on the left *hyperesthesia* in a C7 distribution, in a C8 distribution." Tr. 600. As noted above, Dr. Sassano's assessment regarding current problems again noted "worse" conditions for Plaintiff's cervicalgia, thoracic back pain, lumbago low back pain, and secondary diabetes mellitus/diabetic nephropathy. *Id.*

The ALJ notes that in May 2015, and prior to Plaintiff's last date insured of December 31, 2015, Plaintiff presented to Dr. Guskiewicz[12]

---

[12] After the ALJ entered the decision, on April 14, 2016, Plaintiff's counsel sent the Appeals Council a letter from Dr. Guskiewicz dated May 18, 2016, who noted that he had been treating Plaintiff since May 16, 2015,

> for ongoing cervical pain that has not remitted. Mr. Norton is left with chronic debilitating pain and is taking opioid analgesics, under my supervision, in an attempt to gain a modest form of functionality but he is in no way capable of gainful employment.

> Because of his pain, Mr. Norton can not concentrate on most activities and is distracted by his pain after longer than several minutes. He cannot lift items greater than 10 pounds on a regular basis. He cannot rotate his head without increasing his pain. He needs to change positions regularly to achieve even some pain relief.

with continued reports of generalized pain in his back and upper and lower extremities. Upon physical examination, the claimant exhibited tenderness throughout his back, but straight leg raise testing was negative. Additionally, muscle tone was normal along with normal flexion and extension strength of the bilateral knees. Although limping was observed, heal and toe walking was normal (19F) [Tr. 645-47-May 20, 2015]. Thereafter, the claimant continued pain management treatment with Dr. Guskiewicz, specifically receiving facet joint injections in the spine (27F) [Tr. 764-Dec. 31, 2015].

With the claimant's continued reports of left knee pain, he underwent a left arthroscopy with medial and lateral meniscectomies (26F). At his first postop check, the claimant had no significant pain, with normal range of motion without pin [sic] as well (21F). Thereafter, he continued treatment with Dr. Guskiewicz for pain management. During the physical examination October 2015, the claimant had no localized joint pain and no localized joint swelling. Dr. Guskiewicz would continue with conservative pain management treatment (22F, 23F).[13]

---

I had sent Mr. Norton to Christopher Leber, MD (Physical Medicine and Rehabilitation) to confirm my findings and assessments and Dr. Leber agreed.

It is my medical opinion that, again, Mr. Norton is not capable of gainful employment even in a sedentary capacity.

Tr. 10. The Appeals Council considered this letter, but determined it was new information about a later time, i.e., after December 31, 2015, Plaintiff's date last insured for DIB. Tr. 2.

[13] Plaintiff notes that the ALJ did not identify with particularity the weight given to Dr. Guskiewicz examination and treatment of Plaintiff. ECF No. 16 at 6. Plaintiff notes that Dr. Guskiewicz diagnosed cervical intervert. [sic] disc displacement without myolo., intervertebral cervical disc disorder with radiculopathy in lumbago, Tr. 649. ECF No. 16 at 6. Dr. Guskiewicz referred Plaintiff to Bernabe Marrero, Ph.D., Southeastern Health Psychology, *see supra* at n.2, who began seeing Plaintiff on June 10, 2015, for a psychological evaluation "for individual therapy to enable adaptive coping with chronic pain." Tr. 730-43 (Exhibit 25F), 783-86 (Exhibit 28F), 821-23. The ALJ refers to this visit with Dr. Marrero as June 2014, which is incorrect. Tr. 38. It was June 10, 2015. Tr. 730-33. The ALJ correctly noted that Plaintiff "presented about every month until the end of 2015 for therapy sessions." Tr. 38. (July 27, 2015; Sept. 17, 2015; Nov. 9, 2015; and Dec. 14, 2015, Tr. 734-43, 787-99). It was during the December 14, 2015, evaluation when Dr. Marrero noted that Plaintiff recently received a prescription of

\*\*\*\* [discussion of Dr. Leber, *see infra* at 30-33]

The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSR's 96-2p, 96-5p, 96-6p and 06-3p. The undersigned gives great weight to the opinion of Dr. Bigsby [D.O]. This State agency medical consultant opined that the claimant is capable of work at the light exertional level (4A). The undersigned gives great weight to this opinion because it is consistent with the claimant's wide range of activities of daily living and the medical evidence as a whole.

Tr. 36.[14]

Immediately thereafter, the ALJ concluded her discussion regarding

Dr. Stevenson:

Dr. Stevenson indicated that the claimant is certainly a candidate for disability (3F at 76 [Tr. 460-July 24, 2013], 7F at 3 [Tr. 499 (same)]). The undersigned gives this assessment little weight because it is not consistent with Dr. Stevenson's *later evaluations* which noted that the claimant was doing well following anterior cervical discectomy and fusion (7F at 5 [Tr. 501-July 5, 2012]) and x-rays showed no complicated process of the fusion (7F at 4 [Tr. Sept. 7, 2012]).

---

Xanax from Dr. Guskiewicz "that is proven helpful." Tr. 38, 742, 798. The ALJ did not weigh Dr. Marreo's opinions. Tr. 38.

[14] Dr. Bigsby's analysis of the medical evidence was rendered on July 1, 2014, as part of reconsideration. Tr. 107-10; *see supra* at n.8 re Macia and consideration of daily activities. He is a non-examining state agency physician. Tr. 36. The opinion of a non-examining physician, by itself, does not constitute good cause for giving less weight to a treating physician's opinion, because the opinion of a non-examining physician is entitled to less weight when it contradicts that of the treating physician. Jones v. Bowen, 821 F.2d 551, 554 (11th Cir. 1987). Nor do "[t]he reports of reviewing nonexamining physicians . . . constitute substantial evidence on which to base an administrative decision." Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988).

Tr. 36 (emphasis added).[15]  The ALJ was mistaken.  The "assessment"

favorable to Plaintiff was provided on July 24, 2013, whereas the "later

evaluations," which detract from Plaintiff's claim of disability, were provided

on July 5, 2012, and September 7, 2012, and less than a year *prior* to the

"assessment.  Tr. 460, 499-500.

### C.  Dr. Christopher Leber

The ALJ initially discussed the treatment notes of Dr. Leber after

summarizing Dr. Guskiewicz's notes:

> Most recently, the claimant presented to Dr. Christopher Leber for
> review of his chronic neck and back pain.  Upon examination, there
> was tenderness throughout the claimant spine, most prominent in the
> cervical spine.  Despite this, there were no motor strength deficits in
> the upper and lower extremities.  Additionally, updated x-rays of the
> claimant cervical spine noted that the claimant's previous surgery
> was intact and although there was limited range of motion, there was
> no evidence of instability on flexion or extension views (33F, 35F).

Tr. 36.  After briefly discussing the examination results from Dr. Chodosh,

Tr. 36, and Philip L. Parr, M.D.'s, note "that the claimant was in terrible

physical condition during his assessment in early 2015 [January 20, 2015],"

*id.*,[16] the ALJ returned to Dr. Leber:

---

[15]  *See supra* at n.11.

[16]  The ALJ gives little weight to the assessment of Dr. Parr because Plaintiff only
saw him once and because Plaintiff's knee appeared to be doing better.  (In contrast,
the ALJ gave "great weight" to Dr. Chodosh's opinion, who also examined Plaintiff once
as a consultant.  Tr. 35-36.)  The ALJ also noted: "Additionally, [Dr. Parr] observed that
the claimant was unable to straighten or stand on his knee (17F)."  Tr. 36.  Plaintiff

After his initial examination of the claimant on February 18, 2016, Dr. Christopher M. Leber opined that the claimant cannot return to any type of gainful employment. He also noted that although the claimant's current medications and treatment help to some degree, his functional ability to be safe and effective in an employment situation will not return (33F) [Tr. 825-33]. Dr. Leber also subsequently completed a medical source statement on March 8, 2016 [Tr. 835-36]. In this statement, Dr. Leber opined that the claimant [sic] lift and carry less than 10 pounds occasionally and less than 10 pounds frequently. He also noted that the claimant can stand and walk less than 2 hours in an 8-hour workday and can sit 2 hours in an 8 hour workday. Dr. Leber further opined that the claimant requires the ability to change positions during the day, can occasionally twist and climb stairs, can never stoop, crouch, or climb ladders, and will be absent from work more than four days per month. Dr. Leber observed that the claimant was using a rolling walker to assist with ambulation (34F) [Tr. 835-36]. The undersigned assigns little weight to the opinion of Dr. Leber because Dr. Leber examined the claimant only once, on February 18, 2016. Dr. Leber's opinion is not based on a history of treatment with the claimant; he is not the claimant's treating physician. It does not appear as though Dr. Leber has seen the claimant since the February 18, 2016, visit. While Mr. Springfield, the claimant's attorney, recently submitted additional records from Dr. Leber, as

---

came to Dr. Parr "complaining of a long history of low back pain." Dr. Parr noted: "Impression: This man appears to have some lumbar spondylosis but he looks like he is in terrible physical condition. He is unable to straighten up or stand on his knees straight." Dr. Parr noted that Plaintiff had been on chronic pain management and on Percocet for well over a year as well as other drugs and doubted there was much more to be offered. Dr. Parr ordered an MRI scan to get a definitive diagnosis and Plaintiff was referred to Richard E. Kinard, M.D. Tr. 618, 729. On March 12, 2015, Dr. Kinard noted a prior history of a herniated disc, L4-L5, severe back pain and bilateral leg pain. Tr. 728. An Epidurography was performed and interpreted: "Diagnostic interlaminar lumbar epidural injection of steroids and local anesthetic at L4-L5 level. Interlaminar approach was chosen because the patient has bilateral leg pain." Tr. 729. On September 28, 2015, Dr. Kinard noted the injections were ineffectual and resulted in continued pain management care by Dr. Guskiewicz. Tr. 727. The ALJ did not mention Dr. Kinard. On September 19, 2015, Frank D. Ellis, M.D., performed arthroscopic surgery to repair Plaintiff's left knee medial tear. Tr. 817-18. Plaintiff had no significant pain as of his first postop visit on October 29, 2015. Plaintiff was instructed in a home exercise program, to return as needed, and options discussed should "symptoms worsen or persist in the future." Tr. 819.

afore-mentioned, those records [Tr. 837-45] were duplicates of Exhibit 33F. Additionally, Dr. Leber's opinion is not consistent with the medical evidence of record. X-rays of the claimant's spine, ordered by Dr. Leber, revealed mild to at most moderate findings. The claimant has had surgeries on his neck and left knee that seem to have greatly improved his condition. While the claimant currently ambulates with a rolling walker, no treating source has actually prescribed a rolling walker.

Tr. 37.

Plaintiff was referred to Dr. Leber of Southeastern Rehabilitation

Medicine

by Dr. Guskiewicz for problems related to his chronic musculoskeletal pain with questions regarding impairment and disability reports he has had severe degenerative disk disease since he was a teenager. He has had a cervical spine fusion x 4, level in the past. He reports blown vertebrae in the lumbar spine L1, 2 & 3. He has had problems with anxiety, depression, and paranoia, he has had chronic pain. He has sought all types of pain relief over the years.

Tr. 825; *see supra* at n.12. After providing the examination results,

Dr. Leber provided a narrative assessment of Plaintiff:

Mr. Norton is a gentleman who has multiple musculoskeletal problems which has led to ongoing chronic musculoskeletal pain and dysfunction at this point in time. Due to the objective findings of the multi-level cervical fusion as well as the problems with degenerative changes in the lumbar spine as well as the functional impairments that these musculoskeletal problems have led to for [sic] this gentleman I would state that he would not be able to return to any type of gainful employment in the future. This gentleman has problems with anxiety and depression and history of alcohol issues in the past and is dealing with chronic musculoskeletal pain at the current time. His current medications and treatment help him to some degree but his functional ability

> to every [sic] be safe and effective in an employment situation will
> not return for him. I recommend him for permanent and total
> disability due to the objective findings from his previous surgery
> and diagnostic studies as well as his dysfunction that is apparent
> on his neuromusculoskeletal exam today.

Tr. 832.

According to a post-decision letter submitted to the Appeals Council

dated May 18, 2016, Dr. Guskiewicz sent Plaintiff to Dr. Leber "to confirm

[his] findings and assessments and Dr. Leber agreed." Tr. 10; *see* Tr. 832,

825 (Feb. 18, 2016); *see also supra* at n.12. It appears Dr. Guskiewicz last

treated Plaintiff in December 2015, Tr. 711-17, and on February 1, 2016,

when he referred Plaintiff to Dr. Leber. Tr. 763.

### D. Lance Chodosh, M.D.

On December 19, 2013, Plaintiff was interviewed and examined by

Dr. Chodosh as part of a disability determination. Tr. 539. After discussing

Plaintiff's December 2013 pain management treatment for his neck pain

with Dr. Sassano, the ALJ discusses Dr. Chodosh's consultative

examination results. Tr. 35.

> That same month, the claimant presented to Dr. Lance Chodosh for
> a consultative examination. The examination revealed that the
> claimant is independent in his activities of daily living. The claimant
> is able to bend over at the waist and can squat and rise, but only
> while holding on. Dexterity was found to be adequate and the
> claimant can drive short distances. Upon examination, straight leg
> raise testing was negative in the seated and supine positions. The
> claimant's motor function was grossly normal in all four extremities

with strength judged to be 5/5 throughout, including grips. The claimant's manual dexterity was normal, coordination was good, and he had normal sensation to soft touch and pin. Additionally, his standing balance was normal, he was able to walk on heels and toes, and he was able to squat (11F).

Tr. 35. Later, the ALJ refers to Dr. Chodosh:

> In December 2013, Dr. Lance Chodosh noted that the claimant's chronic pain was of uncertain etiology, without physical signs of major impairment. He further noted that based on the objective evidence, the claimant is able to stand, walk, sit, stoop, squat, kneel, lift, carry, handle objects, see, hear, and speak normally (11F). The undersigned gives great weight to this opinion because it is consistent with work at the light exertional level, but not greater.

Tr. 36. Dr. Chodosh described Plaintiff's extremities and after noting "[j]oint ranges of motion are recorded separately, and limitations are due to pain," Tr. 541, *see* Tr. 535-37 for range of motion testing, he indicated that his "assessment activity could not be completed because claimant complained of pain, or requested that it be stopped." Tr. 542. (The range of motion report form indicates most notable limitations regarding Plaintiff's cervical spine and lesser limitations regarding his lumbar spine extension. Tr. 535. The other range of motion measurements were normal. Tr. 535-37.)[17]

---

[17] Plaintiff argues that the opinions of Drs. Chodosh and Parr are not consistent "with a greatly improved condition." ECF No. 16 at 11. Plaintiff also argues that Dr. Leber's March 8, 2016, two-page medical opinion regarding Plaintiff's ability to work-related activities (physical) is also inconsistent "with a greatly improved condition." *Id.*; *see* Tr. 835-36.

### E. Mental Health Evaluations

The ALJ considered several mental health evaluations.  Tr. 37-38.

A review of the medical evidence or [sic] record pertaining to the claimant's mental impairments reveals that the claimant sought treatment from Dr. Deborah Morris.  He established care in February 2014.  Upon physical examination, the claimant had full range of motion of the cervical spine.  All other systems examined were within normal limits.  Thereafter, he requested assistance is [sic] trying to quit the use of alcohol and was given a referral to address his alcohol abuse.  The claimant did not follow through with the referral for assistance with his substance abuse.  Over a year later, in April 2015, the claimant had still not followed through with the evaluation (18F).

In May 2014, the claimant presented to Dr. Janet Humphreys for a psychological consultative examination.  The claimant reported at this time that he suffers from frequent panic attacks, memory loss, and depression.  He did indicate that he is able to care for his own personal needs.  He is also able to drive short distances, and will occasionally go shopping.  At home, he is able to prepare meals, watches television, and visits with his father weekly.  During the examination, the claimant was cooperative and appeared to be a reliable historian.  He had some difficulties with immediate memory, but remote memory appeared to be intact.  He was able to perform mental addition of double-digit numbers and simple multiplication.  Ultimately, Dr. Humphreys assessed the claimant with major depressive disorder, unspecified personality disorder, and somatic symptom disorder (15F) [Tr. 605-08].[18]

---

[18]  As noted by Plaintiff, the ALJ's recitation of Dr. Humphreys' assessment is incomplete.  ECF No. 16 at 16.  The entire diagnoses included: major depressive disorder, severe with psychotic features; agoraphobia; posttraumatic stress disorder; unspecified personality disorder with obsessive-compulsive traits; and somatic symptom disorder, persistent, with predominant pain.  Tr. 607.  Plaintiff's prognosis was guarded and Dr. Humphreys noted "[h]e may benefit from a pharmacological evaluation and psychotherapy as well as memory testing."  Tr. 608.

Then in June 2014, the claimant presented to Dr. Bernabe Marrero for a psychological evaluation. During the initial interview, the claimant replied that his physical pain results in irritability, frustrated feelings, and wanting to isolate himself. He also noted that he uses alcohol to moderate his pain (25F).

More recently, in June 2015, the claimant presented again to Dr. Marrero for therapy to enable adaptive coping with chronic pain. The claimant presented about every month until the end of 2015 for therapy sessions. During this time, he reported that the prescription medication from Dr. Guskiewicz had proven helpful (28F).

As for the opinion evidence pertaining to the claimant's mental impairments, the undersigned gives little weight to the psychiatric review technique completed by Dr. Nunez. This State agency psychological consultant opined that the claimant has moderate difficulties in social functioning (4A). The medical evidence does not support this finding as the claimant has only had a mild limitation in social functioning evidenced by the fact that he lives with his sister and her husband, has a good relationship with his wife, he drives, and goes grocery shopping.

Dr. Sassano completed a medical source statement regarding the claimant's mental impairments and opined that the claimant does not have a mental impairment that significantly interferes with daily functioning (14F). Some weight is given to this assessment, as the undersigned agrees that the claimant can still function in his daily activities, but does have limitations in his ability to concentrate as evidenced by the evaluation completed by Dr. Humphrey's [sic] showing limitations with immediate memory.

Dr. Humphreys opined in her report that the claimant's concentration and memory appeared impaired and may impact his ability to carry out complex instructions. She further opined that the claimant's social skills and judgment as well as his ability to perform simple, repetitive tasks make be affected by his mood and anxiety (15F) [Tr. 608]. The undersigned gives some weight to this assessment because while the claimant's immediate and recent memory appeared to be impaired, his remote memory was grossly

intact.  Therefore, unskilled work is appropriate, but Dr. Humphreys
further indicated that the claimant's social skills and judgment as
well as his ability to perform simple, repetitive tasks may be
affected by his mood and anxiety.  The doctor's opinion in this
regard is vague and not supported by the medical evidence of
record.

Tr. 37-38.

The ALJ concluded her RFC assessment:

In summary, the above residual functional capacity assessment
accounts for the claimant's limitations and is supported by the
medical evidence.  As for the claimant's physical impairments, the
residual functional capacity limits the claimant to light exertion work
with additional postural and environmental restrictions.  As for the
claimant's moderate limitations in concentration, persistence, or
pace, the residual functional capacity limits the claimant to simple,
routine, and repetitive tasks and limited to simple work-related
decisions.

Tr. 38.

IV.

As noted earlier, an opinion of the claimant's treating physician must

be accorded considerable weight by the Commissioner unless good cause

is shown to the contrary.  Lewis, 125 F.3d at 1440.  The reason for giving

little weight to the opinion of the treating physician must be supported by

substantial evidence.  Marbury, 957 F.2d at 841.  The ALJ may discount

the treating physician's opinion if good cause exists, which includes when

the evidence "supported a contrary finding" or the opinion is "conclusory or

inconsistent with [the treating physician's] own medical records." <u>Lewis</u>,
125 F.3d at 1440.

"To the extent that an administrative law judge commits an error, the
error is harmless if it did not affect the judge's ultimate determination."
<u>Hunter v. Comm'r of Soc. Sec.</u>, 609 F. App'x 555, 558 (11th Cir. 2015)
(unpublished) (citing <u>Diorio v. Heckler</u>, 721 F. 2d 726, 728 (11th Cir. 1983));
<u>Delia v. Comm'r of Soc. Sec.</u>, 433 F. App'x 885, 887 (11th Cir. 2011)
(unpublished) (applying harmless error analysis to Social Security disability
benefits claim).

The ALJ had the Stevenson chronology backward.  It was on *July 24,
2013*, when Dr. Stevenson noted that Plaintiff returned for a follow-up visit;
was status post C3-4, C4-5, and C5-6 anterior cervical diskectomy and
fusion; had "intractable neck pain"; "no evidence of radiculopathy"; "going to
require chronic pain management at this stage"; referred to
Dr. Sassano for pain management; and that Plaintiff "is certainly a
candidate for disability."  Tr. 460, 499.  It was a year earlier on July 5, 2012,
when Dr. Stevenson noted that Plaintiff was doing well and on September
7, 2012, when he noted the lack of a "complicating process of fusion."
Tr. 36, 458-59, 500-01.  On the other hand, during the September 7, 2012,
visit, Dr. Stevenson noted that Plaintiff was still having some cervicalgia

and that he had moderate paraspinous muscle spasm with neck stiffness and that there may be some facet arthrosis at C2-3. The plan included a cervical CT with 3 mm cuts performed. Tr. 500.

The Commissioner argues that although "the ALJ may have mistaken the time at which these records were authored, these records, regardless of their date, support the ALJ's evaluation of Dr. Stevenson's opinion (Tr. 500-01)." ECF No. 17 at 12-13.

Dr. Stevenson was one of Plaintiff's treating physicians for over a year from March 23, 2012, until July 24, 2013. By itself, the ALJ's rejection of Dr. Stevenson's assessment of Plaintiff's functionality would not require reversal even though she was mistaken as to the sequence of events. But, when coupled with the ALJ's consideration of other treating physicians patient notes, including Dr. Guskiewicz, the error becomes pronounced.

The ALJ refers to Dr. Sassano's pain management treatment of Plaintiff from October 2013 through April 2014, but does not mention the weight given to his assessments of Plaintiff. Tr. 35.

In March 2015, Dr. Parr gave Plaintiff an epidural injection at the L4-L5 level. Tr. 728. In May 2015, Plaintiff presented to Dr. Guskiewicz. Tr. 36. On September 28, 2015, Plaintiff was referred to Dr. Kinard for an epidural injection at the L3-L4 level that was provided. Tr. 727.

On September 29, 2015, Plaintiff was examined by Dr. Ellis and diagnosed with a left knee possible medial meniscus tear. Tr. 745. A review of systems was generally normal. *Id.* He had normal motor strength and normal sensation left leg, with well-heeled incisions of the left knee. (Plaintiff underwent an open left knee ACL reconstruction in 1980 after a football injury. Tr. 749). On October 19, 2015, Dr. Ellis performed a diagnostic left knee arthroscopic, partial medial meniscectomy, left knee, and partial lateral meniscectomy. Tr. 750-51. On October 29, 2015, Plaintiff had his first postop check and he had no significant pain at this time, range of motion was 0°–120° without pain, no effusion, and negative McMurray. Plaintiff was instructed in a home exercise program. Tr. 752.

Plaintiff continued with pain management treatment with Dr. Guskiewicz through October 2015, Tr. 36, 679-83, when a review of systems indicated (for musculoskeletal): "back pain and muscle cramps. No localized joint pain and no localized joint swelling. Stiffness localized to one or more joints." Tr. 681. Physical findings for musculoskeletal noted: "Lumbar/Lumbosacral Spine: General /bilateral: Lumbosacral spine exhibited tenderness on palpation. Iliolumbar region exhibited tenderness on palpation. Lumbosacral spine exhibited a normal appearance." *Id.* The assessment included lumbago and intervertebral cervical disc disorder with

radiculopathy. Tr. 682. Plaintiff was given a prescription for oxycodone for low back pain for 30 days and no refills. *Id.*

Plaintiff returned to Dr. Guskiewicz on December 21, 2016, for "[t]echnically successful intraarticular facet joint injections at the right C6-7, C5T1 and T3-4 levels uroscopic guidance," Tr. 764, and on December 28, 2015, for continued pain management. Tr. 711. There are no specific physical findings under musculoskeletal for the December 28th visit. Tr. 713. The prescription for oxycodone was renewed. Tr. 714; *compare with* the November 30, 2015, Dr. Guskiewicz's physical findings related to Plaintiff's thoracic spine (generally normal) and lumbar/lumbosacral spine - lumbosacral spine and iliolumbar region exhibited tenderness to palpation; lumbosacral spine pain elicited by motion; and lumbosacral spine exhibited a normal appearance. Tr. 721.

Plaintiff returned to Dr. Guskiewicz on February 1, 2016, complaining of neck and feet pain.[19] Tr. 754-56, 759. A review of systems under

---

[19] Plaintiff reported taking oxycodone and alprazolam "and doing fair." He was also seeing a chiropractor. Tr. 759. The primary problem related to Plaintiff's "right mid back pain. Non descriptor but can be very painful at times. . . . He has disability determination hearing in the spring and wants referral to rehab medicine for determination." *Id.* Under review of systems and for musculoskeletal it is noted: "Back pain and muscle cramps. No localized joint pain and no localized joint swelling. Stiffness localized to one or more joints." Tr. 761. He diagnosed lumbago and intervertebral cervical disc disorder with radiculopathy. Tr. 762. Notes further indicate that Plaintiff was referred to rehabilitation medicine for low back pain with "Instructions: disability determination." Tr. 763. On February 18, 2016, Dr. Leber examined Plaintiff. Tr. 825 (Exhibit 33F), 837 (Exhibit 35F).

musculoskeletal notes: "Back pain and muscle cramps. No localized joint pain and no localized joint swelling. Stiffness localized to one or more joints." Tr. 756. The assessment included a prescription for more than a 72-hour dose of controlled substances for treatment of chronic nonmalignant pain because of lumbago and intervertebral cervical disc disorder with radiculopathy. Tr. 757.

Dr. Leber examined Plaintiff once on February 18, 2016, as a new patient and evaluated Plaintiff "only for disability purposes." Tr. 825; 832. Plaintiff's chief complaints were neck, back, nerve, and chronic pain. Tr. 825. Dr. Leber noted that Plaintiff "was referred by Dr. Guskiewicz for problems related to his chronic musculoskeletal pain with questions regarding impairment and disability he reports he has had severe degenerative disk disease since he was a teenager," and "has sought all types of pain relief over the years." *Id.* Dr. Leber reviewed portions of Plaintiff's medical history. Tr. 826-27. Physical findings included for musculoskeletal: "Gait is impaired - he uses a RW with seat. The patient goes from sitting to standing with extreme difficulty. Cervical spine - decreased AROM in the c spine with no crepitus or instability identified[.] [M]oderate pain to palpation in the C PSs and trapezius muscles bilaterally[.] [N]o spasm or atrophy in the C PSs and trapezius muscles

bilaterally. Thoracic spine - mild tenderness to palpation in the T spine midline, no step offs[.] [M]od tenderness in the Thoracic PSs bilaterally[.] [N]o flame tenderness bilaterally." Tr. 828. Regarding the lumbar spine, it is noted moderate tenderness to palpation in the lumbar spine midline; no palpable step offs in the lumbar spine midline; mild spasm in the LS PS muscles bilaterally; and no decreased AROM in all planes of the lumbar spine motion is observed. Tr. 829. Diffuse tenderness to palpation is noted in the shoulder, elbow, wrist or fingers for the right and left upper extremity, whereas diffuse tenderness to palpation is noted in the hip, knee, or ankle, thigh or leg in the right and lower extremities. *Id.* Decreased AROM is noted in the upper extremities bilaterally and Plaintiff lacks full shoulder motion B; decreased AROM in the lower extremities bilateral with tight hamstrings B; no deformities, laxity, or crepitus in the upper and lower extremities B. *Id.* Other findings are mentioned throughout these patient notes. Tr. 830-32. Dr. Leber concludes his assessment/plan recommending Plaintiff "for permanent and total disability due to the objective findings from his previous surgery and diagnostic studies as well as his dysfunction that is apparent on his neuromusculoskeletal exam today." Tr. 832.

On March 8, 2016, Dr. Leber provided a medical opinion that conflicts with the ALJ's RFC assessment.  Tr. 835-36.  The ALJ gave "little weight" to Dr. Leber's opinion because he "examined the claimant only once, on February 18, 2016."  Tr. 37.

On May 18, 2016, and after the ALJ's decision of April 14, 2016, Dr. Guskiewicz noted his treatment of Plaintiff and his assessment of his functional abilities, opining that Plaintiff "is not capable gainful employment even in a sedentary capacity."  Tr. 10; *see supra* at n.12.  He further noted that he sent Plaintiff to Dr. Leber to confirm his findings and assessments and noted that Dr. Leber agreed.  *Id.*  The Appeals Council rejected this letter because it was about a later time, i.e., after December 31, 2015, the last date insured for DIB.  Tr. 2.

Plaintiff was interviewed and examined by agency consultant, Dr. Chodosh, on December 19, 2013, as part of a disability determination, and two years prior to Plaintiff's date last insured.  Tr. 539.  The ALJ considered his evaluation and gave his opinion "great weight."  Tr. 35-36. On July 1, 2014, state agency consultant, Dr. Bigsby, examined the record and opined that Plaintiff was capable of work at the light exertional level. The ALJ gave this opinion "great weight" "because it is consistent with the

claimant's wide range of activities of daily living and the medical evidence as a whole." Tr. 36.

On the other hand, the ALJ gave "little weight" to Dr. Parr's early 2015 assessment, observing in part "that the claimant was unable to straighten or stand on his knee," because he only saw Plaintiff once. Tr. 36. The ALJ likewise gave "little weight" to Dr. Stevenson's opinion of July 24, 2013, noting that Plaintiff "is certainly a candidate for disability (3F at 76, 7F at 3)," mistakenly finding that this was an earlier evaluation that conflicted with a later evaluation. *Id.*

The ALJ makes mention of Dr. Guskiewicz' pain management care beginning May 20, 2015, and continuing until October 2015, but does not identify with particularity the weight given to this treating physician's opinion. Tr. 36. It was Dr. Guskiewicz, a treating physician, who referred Plaintiff to Dr. Leber in February 2016, Tr. 763, to confirm his opinion of Plaintiff's condition, i.e., that Plaintiff "is not capable gainful employment even in the sedentary capacity." Tr. 10. The ALJ assigned "little weight to the opinion of Dr. Leber because Dr. Leber examined the claimant only once," and because his opinion was not "based on a history of treatment of" Plaintiff and he was "not the claimant's treating physician." Tr. 37.

Dr. Guskiewicz referred Plaintiff to a rehabilitation specialist for a disability determination, not for treatment. At the very least, Dr. Leber's examination of Plaintiff confirmed Dr. Guskiewicz' opinion regarding Plaintiff's inability to function in the workplace. It is at least a fair inference that Dr. Guskiewicz felt Plaintiff might be disabled as late as February 1, 2016, although he treated Plaintiff in 2015. It was not until his May 18, 2016, letter that Dr. Guskiewicz' opinion regarding Plaintiff's disability appears in the record.

The ALJ was not aware of Dr. Guskiewicz' ultimate opinion recited in his May 18, 2016, which post-dated the decision. Tr. 10. But, the ALJ was aware that Dr. Guskiewicz had referred Plaintiff for a disability determination on February 1, 2016, Tr. 763, and was aware of Dr. Leber's February 18, 2016, assessment. Tr. 37, 832. Standing alone, the ALJ properly gave little weight to Dr. Leber's opinion because he examined Plaintiff once. Tr. 37. Although Dr. Leber's opinion was rendered after Plaintiff's last date insured, his assessment supported Dr. Guskiewicz' concern that Plaintiff might be disabled.

The Appeals Council considered Dr. Guskiewicz' May 18, 2016, letter, but determined it was "about a later time" and, as a result, gave it no weight. Tr. 2. The letter post-dated Plaintiff's last date insured of

December 31, 2015, but confirmed what he thought - Plaintiff was unable to

work. It is not clear in the record, however, that Dr. Guskiewicz believed

Plaintiff was unable to work or disabled for a continuous period of not less

than 12 months prior to December 31, 2015, and the Court acknowledges

that it is the Commissioner's duty to make the determination of disability,

not a treating physician. 20 C.F.R. § 404.1527(d); <u>Denomme v. Comm'r</u>

<u>Soc. Sec. Admin.</u>, 518 F. App'x 875, 878 (11th Cir. 2013) (unpublished);

*see* ECF No. 17 at 11-12. Also, both the "impairment" and the "inability" to

engage in any substantial gainful activity must be expected to last not less

than 12 months. <u>Barnhart v. Walton</u>, 535 U.S. 212 (2002).[20]

Nevertheless, in light of the rather unique circumstances of this case,

good cause has not been shown for rejection of the opinions, at the very

least, of Drs. Stevenson and Guskiewicz, both treating physicians.

Substantial evidence does not support the ALJ's favorable treatment of the

opinions of Drs. Chodosh and Bigsby when the medical evidence is

reviewed as a whole notwithstanding the weight given by the ALJ to

Plaintiff's daily activities and several inconsistencies, which appears to be

---

[20] The Appeals Council stated that Dr. Guskiewicz' letter ("Medical-Source Statement-Physical"), Tr. 10, was about a later time. Tr. 2. The letter was written after the last date insured and the decision, but confirmed a conclusion he had apparently reached, predicated on the treatment he and others provided Plaintiff prior to December 31, 2015, Plaintiff's last date insured and confirmed by Dr. Leber. But, whether Plaintiff became disabled prior to his date last insured must be determined on remand.

prominent in the ALJ's decision.  *See supra* at 21-24.  No decision is reached regarding whether Plaintiff is disabled.

## V.  Conclusion

Considering the record as a whole, the findings of the ALJ are not based upon substantial evidence in the record and the ALJ incorrectly applied the law.  Accordingly, the decision of the Commissioner to deny Plaintiff's application for Social Security disability benefits is **REVERSED** and the case is **REMANDED** to the Commissioner further proceedings. The Clerk is **DIRECTED** to enter judgment for the Plaintiff.

**IN CHAMBERS** at Tallahassee, Florida, on August 15, 2017.

s/ Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**